### N. B. ROBERTSON v. THE STATE.

*No. 3908.    Decided December 2.*

1. **Assault with Intent to Rape—Force—Want of Consent.**—See the opinion for a statement of the evidence on a trial for assault with intent to commit rape, *held* wholly insufficient to sustain a conviction for that crime, because it failed to show a specific intent to commit rape; no force was proved, nor is the consent of the alleged assaulted female sufficiently negatived.

2. **Indecent Familiarity with Person of Female—Aggravated Assault—Charge of Court.**—Violent and indecent familiarity with the person of a female without her consent, and without the specific intent to rape, by an adult male person, is an aggravated assault, and in such a state of case disclosed on the trial of a prosecution for assault with intent to rape it is error for the court to fail or refuse to charge the law of aggravated assault.

APPEAL from the District Court of Bosque.    Tried below before Hon. J. M. Hall.

Appellant was convicted of an assault with intent to commit rape, and his punishment assessed at two years in the penitentiary. The evidence is stated in the opinion of the court.

*Lockett & Kimball,* for appellant.

*H. S. Dillard,* County Attorney of Bosque County, and *R. H. Harrison,* Assistant Attorney-General, for the State.

DAVIDSON, JUDGE.—Appellant was convicted of an assault with intent to rape one Nettie Cheek, and his punishment assessed at confinement in the penitentiary for a term of two years.

The evidence against the accused was chiefly the testimony of the prosecuting witness, Nettie Cheek, a girl between 11 and 12 years of age, who detailed the particulars of the alleged offense substantially as follows: She testified that during the absence of her mother and step-father from home at Norway Mills, Bosque County, about the 19th day of July, 1890, she had been sent by them to stay at the house of a neighbor, an old lady, the mother of defendant, about a quarter of a mile distant. That while there defendant, who had been employed by her father to post up his books, requested her to go back to her parents' house to get some account books which he could not find. That she offered to go and get the books, but made defendant promise not to follow her, but to stay where he was till her return. That on coming back out of the house defendant met her at the gate; asked her to return to the house with him; took her by the hand, and led her back to the house. That he first took her into a room at the end of the gallery, where, after locking the door and letting down the window-shade, he took her in his lap and felt of her, and tried to persuade her to let him "do it" to her, by telling her that he had done it to another little girl, who was younger than her. That he continued to hold her in his lap and feel of her person for about fifteen minutes.

That he then carried her to the door, led her by the hand across the gallery and into another room, lifted her upon the bed, removed her drawers, unbuttoned his pants, and placed himself upon her person. That he remained in that position for about two minutes, and while he lay upon her did not do anything else, did nothing with his hand, did nothing at all except to lie upon her. That while he was lying upon her he was called to the door by two young men who came for their mail—the postoffice being kept at the house. That he left her to go to get them their mail, and that she got up and went out on the gallery where the young men were. That she knew them, and spoke to them, but made no complaint to them; and that she afterward left the house and went back to Mrs. Robertson's.

She testified that she knew all about defendant's ways when he asked her to go for the books, and that was the reason why she made him promise to stay where he was until she went for them. That she knew what he wanted when he asked her to go back to the house with him, because she "had heard of his capers before;" and he had tried to feel of her once before, when she went to school to him.

Emmet Gibbins and Tom Williams, the men who had called for their mail, testified—the first for the State, the second for the defendant— that when the defendant came out of the house to answer to their call they got off their horses and went up to the gallery, and that Nettie came out on the gallery where they were; that they knew her, and she spoke to them and they to her; that she made no complaint to them, and that she was not crying, and displayed no agitation, excitement, alarm, embarrassment, or distress, and they observed nothing unusual about her dress or manner.    Williams states further, that when defendant first came out of the house he left the door wide open, and witness saw Nettie standing on the floor.    That she remained on the gallery while defendant was in the house, getting the mail, for five minutes, and did not try to leave, but staid there until witness and his companion mounted their horses and rode off; and when he last saw her she was still standing on the gallery.

Mrs. Robertson, defendant's mother, also testified that she saw no evidence of discomposure of any kind about Nettie when she returned to the house.    That she made no complaint, but went to play with the other children as usual.    That defendant returned to the house while the children were still there, and Nettie went out on the gallery where he was, and she saw them talking, and she saw nothing unusual in their manner toward each other; and when Nettie left she bade her good evening, and said, "You must be sure and come and see us."

Mr and Mrs. Mayfield, the mother and stepfather of Nettie, also testified, that they saw nothing unusual about her when she returned home that night.    That she made no complaint, but ate her supper, and went to bed as usual.    And Mrs. Mayfield further said, that she did not seem sick or hurt or distressed or troubled in any way; and subsequently, when defendant was at their house, and staid to supper, and her daughter was also there, she saw nothing unusual in their demeanor toward each other.    But she stated that about a week after the date of the alleged assault, upon her desiring Nettie to go to Mrs. Robertson's on an errand, she said that she did not want to go, but finally went with her sister; and that about the middle of September, having desired Nettie to stay in the house with the children while witness went to the spring to wash, she refused, and, being pressed for a reason, at first said she was afraid to tell, but finally told her that she saw defendant at the store, and gave witness an account of how he had treated her, and witness then told her husband.

Mr Mayfield also testified that his wife told him what her daughter told her about six weeks after the alleged occurrence; that when he first heard it he did not believe it, and so said to his wife, but after interrogating Nettie's little sister, and hearing from her what Nettie had told her, he accepted it as true, and wished defendant prosecuted.    Mr. Mayfield stated that he had thought highly of defendant for a long time,

and he and his wife both testified that defendant had always been welcome at their house.

The State introduced J. Dansby and John Hill to prove a confession of guilt by the defendant, on which point their testimony was substantially as follows · Dansby testified, that about September 17, 1890, he received a letter from Hill, asking him to come that night to Norway Mills. That he went, accompanied by another man, and arriving there, found a number of other citizens assembled to take action in regard to defendant's treatment of Nettie Cheek. That about 8 o'clock that night witness and another man went to defendant's house, called him out, told him they wanted him to walk down the street with them, which defendant did, and went to the store house where the other men were awaiting them. One of the men present informed defendant that they wanted to know what he had been doing to Mayfield's girl, Nettie Cheek, to which defendant made no reply, but looking toward witness, said he would like to talk to him in private. That witness and defendant then walked off about one hundred yards, when defendant repeated a number of times some remarks to the effect that he did not know what was the matter with him; that the devil must be in him; that he had been thinking of trying to get them to send him to a lunatic asylum. That witness told him he had better leave the country. That defendant replied that his affairs were in such a shape that he did not see how he could do so. That witness told him it would be the best thing for him to leave, and they then walked back to the rest of the crowd. That one of them said, "Is he guilty?" That defendant made no reply, but witness answered for him, "Yes, he is guilty, and he is going to leave the country," and defendant remained silent.

Hill also testified, that he was present when the visit was made to the defendant. Heard him informed of the object of the meeting, as stated by Dansby. Heard him asked, after his return from his talk with Dansby, if he was guilty, and heard Dansby answer for him. And he further testified, that he also asked defendant if he was guilty of the charge, and defendant replied, "I am." But Dansby testified, that when he answered for defendant that he was guilty he had not informed the defendant what the charge against him was, and that so far as he heard defendant had not been informed by any one what he was charged with. That he supposed defendant knew what he was charged with from the question asked, as above stated, when he was first brought before the crowd. There is no evidence in the record to show that he was ever informed of the charge against him.

Both Dansby and Hill say that no threats were made against him. Dansby says that their intention was to get defendant to leave the country, and that if he did not do so, to prosecute him, but that their intentions were not made known to defendant. He says that defend-

ant in the presence of the crowd was cool and self-possessed, and showed no sign of fear. Defendant, however, did leave the country, and the testimony of Deputy Sheriff Metcalf shows that he was brought back to answer to the indictment from Robertson County. This is the entire evidence in the case, substantially stated from the record.

We are of opinion that the evidence in this case does not disclose the offense of assault with intent to commit rape. That degree of force requisite under the statute is not only not proved, but is excluded by the State's testimony. Nor do the facts as fully negative the consent of the female assaulted as should be done in a case of this character in order to warrant the conviction for the offense charged. Willson's Crim. Stats., sec. 867.

In order to constitute the offense of which this appellant was convicted the evidence must disclose the specific intent to rape. No other intent will suffice. This was not done.

Appellant contends that the law of aggravated assault should have been given in charge to the jury. We are of opinion that this contention is correct also. Violent and indecent familiarity with the person of a female without her consent, and without the specific intent to rape, by an adult male person is an aggravated assault. Veal v. The State, 8 Texas Ct. App., 474; Pefferling v. The State, 40 Texas, 486; Ridout v. The State, 6 Texas Ct. App., 249; Sanford v. The State, 12 Texas Ct. App., 196.

The other supposed errors urged by appellant are not tenable. For the errors mentioned, the judgment is reversed and the cause remanded.

*Reversed and remanded.*

Judges all present and concurring.